IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| DALE KEITH PAYNE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No.  3:15-CV-2557-BH |
| | § | |
| CAROLYN COLVIN, ACTING, | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | Consent |

## MEMORANDUM OPINION AND ORDER

Pursuant to the consent of the parties and the order of reassignment dated October 20, 2015 (doc. 15), this case has been transferred for the conduct of all further proceedings and the entry of judgment. Before the Court are *Appellant's Brief in Support of Claim*, filed November 20, 2015 (doc. 17), and *Defendant's Response Brief*, filed June 1, 2016 (doc. 28). Based on the relevant filings, evidence, and applicable law, the Commissioner's decision is **AFFIRMED**.

## I.   BACKGROUND[1]

### A.   Procedural History

Dale Keith Payne (Plaintiff) seeks judicial review of a final decision by the Acting Commissioner of Social Security (Commissioner) denying his claim for supplemental security income (SSI) under Title XVI of the Social Security Act. (R. at 14.) On November 29, 2010, Plaintiff applied for SSI, alleging disability due to his depressive and anxiety disorder. (R. at 14.) His claim was initially denied on December 12, 2010, and upon reconsideration on June 10, 2011. (R. at 149-52, 158-60.) Plaintiff requested a hearing before an administrative law judge (ALJ), and

---

[1] The background information comes from the transcript of the administrative proceedings, which is designated as "R."

he appeared and testified at a hearing on September 13, 2012. (R. at 90-124.) A supplemental hearing before the ALJ was held on January 9, 2013. (R. at 65-89.) On February 22, 2013, the ALJ issued a decision finding Plaintiff not disabled. (R. at 132.) Plaintiff timely appealed to the Appeals Council, which vacated the ALJ's decision and remanded the case for further proceedings on June 19, 2013. (R. at 144-48.)

On June 18, 2014, Plaintiff personally appeared and testified at another hearing before the ALJ. (R. at 863-99.) The ALJ denied his claims on October 6, 2014, finding him not disabled. (R. at 11-30.) Plaintiff timely appealed the ALJ's decision to the Appeals Council. (R. at 10.) The Appeals Council denied his request for review, and the ALJ's decision became the final decision of the Commissioner. (R. at 1-3.) Plaintiff timely appealed under 42 U.S.C. § 405(g).

**B.**   **Factual History**

**1.**   **Age, Education, and Work Experience**

Plaintiff was born on April 17, 1958, and was 56 years old at the time of the hearing. (R. at 871-72.) He had a high school diploma and was able to communicate in English. (R. at 24.) He had past relevant work experience as a carpet cleaner. (R. at 24.)

**2.**   **Medical, Psychological, and Psychiatric Evidence**

On January 16, 2008, Plaintiff met with Judith Hunter, M.D., and Michael McCorkle, qualified mental health professional, of Metrocare Services for treatment for his depression. (R. at 523-27.) Plaintiff reported that he woke up several times a week with nightmares and often felt anxious, and that his personal relationships were being negatively impacted. (R. at 525-27.) Dr. Hunter prescribed him antidepressant medication. (R. at 525.) Plaintiff also received "skills training" for his depression with Metrocare. (R. at 527.)

2

Plaintiff missed his routine follow-up appointments at Metrocare Services on March 24, 2008, and March 27, 2008, but he did attend on April 18, 2008, and May 19, 2008.  (R. at 528-42.) He received psychosocial rehabilitation with Kristen Cathey, clinical manager, of Metrocare Services, and Dr. Hunter wrote a prescription refilling his antidepressants. (R. at 530-33, 540-42.) Plaintiff reported that he was still having nightmares and difficulty sleeping and that he was "real paranoid." (R. at 532.) It was also noted that Plaintiff had been non-compliant with his prescribed medication and had "minimal understanding of the target symptoms of his medication." (R. at 532.)

Plaintiff missed his routine follow-up appointments at Metrocare Services on July 21, 2008, and July 24, 2008. (R. at 544-45.)[2]

On November 30, 2010, Plaintiff received a psychiatric diagnosis interview exam by Patricia Newton, M.D., of Metrocare Services. (R. at 464-80.) She noted that he reported feelings of being dejected, had suicidal thoughts, and had a "significant" substance abuse history, including problems with alcohol, heroin, and other pills. (R. at 465.) Dr. Newton assigned Plaintiff a current Global Assessment Functioning[3] (GAF) score of 35 and diagnosed him with major depressive disorder and posttraumatic stress disorder. (R. at 467.) She prescribed antidepressant and antipsychotic medication. (R. at 468.)

On January 3, 2011, Barbara Fletcher, Psy. D., performed a consultative examination on Plaintiff to assess his psychological and mental status. (R. at 481-86.) She noted that he reported symptoms of posttraumatic stress disorder associated with his traumatic experiences in prison, which resulted in sleep disturbances, nightmares, flashbacks, hypervigilance, and difficulty concentrating.

---

[2]  No additional medical records between July 24, 2008, and November 30, 2010, were included in the record.

[3]  GAF is a standardized measure of psychological, social, and occupational functioning used in assessing a patient's mental health.  *See Boyd v. Apfel*, 239 F.3d 698, 700 n. 2 (5th Cir. 2001).

(R. at 483-84.) Dr. Fletcher assigned Plaintiff with a current GAF score of 43 and diagnosed him with major depressive disorder, postraumatic stress disorder, and provisional opioid dependance with sustained full withdrawal. (R. at 485.)

On March 3, 2011, Robert White, Ph. D., a state agency medical consultant (SAMC), completed a Psychiatric Review Technique (PRT) form. (R. at 504-17.) He determined that a residual functional capacity (RFC) assessment was necessary and completed a Mental Residual Functional Capacity Assessment Form. (R. at 518-21.) He opined that Plaintiff had mild restrictions in daily living, moderate difficulties in maintaining social functioning and concentration, persistence or pace, and that he was "able to understand, remember, and carry out simple instructions, make simple decisions, concentrate for extended periods, interact with other, and respond to changes." (R. at 514-20.) He ultimately determined that Plaintiff did "not reflect a degree of mental/emotional signs or symptoms that work related abilities/activities would be significantly/consistently compromised." (R. at 516.)

On May 12, 2011, Dr. Newton and Marcia Harris, Advanced Practitioner Nurse, of Metrocare Services completed a medical assessment of ability to do work-related activities (mental) form for Plaintiff. (R. at 606-08.) They opined that he had "extreme limitations" in twelve mental categories, including understanding instructions, responding appropriately to work situations, and adapting to changes in a work routine. (R. at 606-07.) They assigned Plaintiff a current GAF score of 35 and diagnosed him with major depressive disorder, posttraumatic stress disorder, and a substance dependance that was in early full remission. (R. at 607.)  They noted that clinical signs of mental illness manifested during treatment, including crying spells, sleep disturbance, paranoia, low energy, chronic disturbance of mood, difficulty thinking, and suicidal thoughts. (R. at 607.)

They also opined that Plaintiff would be absent from work more than four days a month due to his impairment, symptoms, and treatment. (R. at 608.)

From November 30, 2011, to July 31, 2012, Plaintiff received treatment at Metrocare Services for adult mental health individual counseling, pharmacological management, and brief office visits with nurses and social workers regarding his medication status. (R. at 487-503, 522-569, 611-76.) The medical treatment notes show that Plaintiff was consistently improving while on medication, and it was frequently noted that he was able to function more and more independently. (R. at 497, 541, 618.)

On November 20, 2012, Dr. Newton and Nurse Harris of Metrocare Services submitted a letter explaining that Plaintiff had relapsed into alcohol abuse after being unable to get medications in a timely manner in July 2012. (R. at 678.) They also noted, however, that he did "not appear to have ongoing use" or alcohol dependency after this relapse. (R. at 678.)

From September 25, 2012, to March 18, 2014, Plaintiff continued his regular treatment at Metrocare Services with Nurse Harris for routine follow-up visits and pharmacological management. (R. at 679-716, 787-93.) She noted that he was "responding well to current medications," but his symptoms worsened when he did not take them. (R. at 691.) She also noted that he experienced increased frustration and irritability because he was denied for his social disability benefits. (R. at 695.) Plaintiff reported during these treatment sessions that "it [felt] like [he was] not progressing at all." (R. at 699.) Nurse Harris noted that he continued o "need extensive medication management to assist with controlling aggressive mood, paranoia, and irritability." (R. at 713.)

From November 19, 2013, to June 6, 2014, Plaintiff began treatment at the North Texas Veterans' Affairs Health Care System (North Texas VA) in Dallas. (R. at 717-862.) He was

diagnosed with posttraumatic stress disorder and schizoaffective disorder, bipolar type. (R. at 749-51.) He was also diagnosed with hepatitis C. (R. at 728.) During treatment on June 9, 2014, it was noted that Plaintiff had lost over 16 pounds since March 20, 2014, because of "decreased appetite due to depression" and "finding out that he had [hepatitis C]." (R. at 816.)

### 3.      The ALJ's Findings from February 22, 2013

The ALJ issued his decision denying benefits on February 22, 2013. (R. at 132-39.) At step one,[4] he found that Plaintiff had not engaged in substantial gainful activity since November 29, 2010. (R. at 132.) At step two, he found that Plaintiff had the following severe impairments: major depressive disorder with psychotic features, anxiety disorder, and posttraumatic stress disorder. (R. at 132.) Despite those impairments, at step three, he found that Plaintiff had no impairment or combination of impairments that met or equaled the severity of one of the impairments listed in the social security regulations. (R. at 132.) The ALJ determined that Plaintiff retained the RFC to perform a full range of work at all exertional levels but with the following nonexertional limitations: simple routine tasks with no more than occasional contact with the public. (R. at 133.) The ALJ also found that drug and alcohol abuse was a material factor in this case. (R. at 139.)

At step four, the ALJ determined that Plaintiff could not return to any of his past relevant work. (R. at 138.) At step five, the ALJ relied upon the VE's testimony to find Plaintiff capable of performing work that existed in significant numbers in the national economy, including jobs such as shirt presser, garment sorter, and printed produce assembler. (R. at 138-39.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from November 29, 2010, through the date of his decision. (R. at 139.)

---

[4] A five-step analysis, which is described more fully below,  is used to determine whether a claimant is disabled under the Social Security Act.

4.      **Order of Appeals Council Remanding Case to ALJ from June 19, 2013**

On June 19, 2013, the Appeals Council issued an order vacating the ALJ's February 22, 2013, decision and remanding the case to the ALJ for further proceedings. (R. at 144-47.) The Council found that the ALJ was conclusory and did not provide sufficient evidence from the medical record in his assessment that Plaintiff's mental impairments resulted in mild restrictions in activities of daily living and moderate difficulties in concentration and persistence/pace. (R. at 145.) They also found that the ALJ failed to properly weigh Plaintiff's limitations regarding the effects of his alcohol abuse pursuant to the provisions in 20 CFR 416.935(b)(2) and Public Law 104-121. (R. at 145-46.)

The Appeals Council ordered the ALJ to obtain updated medical records from the Plaintiff's treating and other medical sources. (R. at 146.) The Council instructed the ALJ to evaluate Plaintiff's alcohol abuse and his subjective complaints and to reconsider his maximum residual functioning capacity and to provide appropriate rationale with specific references to evidence of record. (R. at 146.) The Appeals Council also instructed the ALJ to obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on Plaintiff's occupational base and to determine whether he was disabled, taking into consideration all of the impairments. (R. at 146-47.) Finally, the Appeals Council required the ALJ to offer Plaintiff an opportunity for a hearing, address the evidence which was submitted with the request for review, and take any further action needed to complete the administrative record, and issue a new decision.  (R. at 147.)

5.      **Hearing Testimony from June 18, 2014[5]**

On June 18, 2014, Plaintiff and a vocational expert (VE) testified at a hearing before the

---

[5]  A hearing before the ALJ was also held on September 13, 2012, and a supplemental hearing was held on January 9, 2013. (R. at 90-124, 65-89.) This testimony is not included because it is not relevant to or cited in Plaintiff's two issues on appeal. (*See* doc. 17.)

ALJ. (R. at 863-99.) He was represented by an attorney. (R. at 863.)

### a.    *Plaintiff's Testimony*

Plaintiff testified that he was born on April 17, 1958, and was 56 at the time of the hearing. (R. at 872.) He was married with no dependent children under the age of eighteen. (R. at 872.) He had not worked since November 2010, and had been receiving treatment at Metrocare Services and the North Texas VA for posttraumatic stress disorder and other psychological impairments since that time. (R. at 872.) He explained that he was not seeing the North Texas VA exclusively because he did not "trust the government." (R. at 874.) He was taking all of his prescribed medication, but his condition had not improved at all. (R. at 873, 878.) He also had an application for veterans' disability pending for his posttraumatic stress disorder. (R. at 875.)

Plaintiff testified that his mental problems were preventing him from working. (R. at 880.) He had frequent nightmares that woke him up and prevented him from sleeping during the night. (R. at 875-76.) He also suffered from auditory and visual hallucinations three to four times a week that occurred more frequently when he was "excited, mad, or upset." (R. at 877.) His anxiety resulted in violent outbursts and many fights with his wife. (R. at 878-79.) He had thoughts of suicide because he did not feel "whole as a person." (R. at 879.) He had a substance abuse problem with alcohol but had been sober since November 2010, with one relapse in July 2012. (R. at 867, 881.)

Plaintiff testified that he was a deacon and had been active in his church for the past five years. (R. at 883.) He also helped to mentor children and other adults by telling them his story. (R. at 884.) He only attended church with his wife in case he had an "angry outbreak." (R. at 886-87.)

### b.    *VE's Testimony*

The VE testified that Plaintiff had past relevant work as a carpet cleaner (DOT 369.384-014,

8

medium, SVP: 5). (R. at 888.)

The ALJ asked the VE to consider a hypothetical person with the same age, education, and work background as Plaintiff. (R. at 888.) This hypothetical person had "no physical limitations, however, he had marked difficulty in concentration, persistence and pace, as well as moderate difficulties in social functioning." (R. at 888.) He was "limited to simple, routine, repetitive tasks, those consistent with unskilled work . . . that is learning by rote with simple and direct supervision [with] no workplace changes or few workplace changes." (R. at 888.) He also required "simple and direct supervision" where "little judgment is required" and "no more than incidental contact with coworkers." (R. at 889.) The ALJ asked if that hypothetical individual could perform any of Plaintiff's past relevant work, and the VE said no. (R. at 889.)

The ALJ then asked if there were "other jobs that exist in the economy such a hypothetical individual could perform." (R. at 889.) The VE replied that there were at least three jobs that he could identify:  hospital cleaner (DOT 323.687-010, medium, SVP: 2) with 100,000 jobs in Texas and 300,000 nationally; industrial sweeper cleaner (DOT 389.683-010, medium, SVP: 2) with 80,000 in Texas and 1,000,000 nationally; and hand packager (DOT 920.587-018, medium, SVP: 2) with 9,000 in Texas and 160,000 nationally. (R. at 889.)

The ALJ added another limitation to the hypothetical in that the individual was "anticipated to miss more than four days of work a month on a regular, routine, and ongoing basis" and "unable to maintain concentration for a two hour period." (R. at 889-90.) The VE replied that the hypothetical individual would not be able to maintain full time, competitive employment in the national economy. (R. at 890.)

The ALJ then asked if a hypothetical individual who had "extreme loss of ability to act

9

appropriately with the general public and get along with coworkers without distracting them" would be able to find full time competitive employment in the economy. (R. at 890-91.) The VE replied that this individual would not be able to maintain full time, competitive employment in the national economy. (R. at 891.)

C.    **The ALJ's Findings from October 6, 2014**

The ALJ issued his decision denying benefits on October 6, 2014.  (R. at 11-30.)  At step one, he found that Plaintiff had not engaged in substantial gainful activity since November 29, 2010. (R. at 16.) At step two, he found that Plaintiff had the following severe impairments: major depressive disorder with psychotic features, anxiety disorder, and posttraumatic stress disorder. (R. at 16.) Despite those impairments, at step three, he found that Plaintiff had no impairment or combination of impairments that met or equaled the severity of one of the impairments listed in the social security regulations. (R. at 16.)  The ALJ determined that Plaintiff's subjective complaints were not credible to the extent alleged. (R. at 22-23.) The ALJ determined that Plaintiff retained the RFC to perform a full range of work at all exertional levels with the following nonexertional limitations: simple routine tasks with no more than occasional contact with coworkers, supervisors, and only incidental contact with the general public. (R. at 18.)

At step four, the ALJ determined that Plaintiff could not return to any of his past relevant work. (R. at 24.) At step five, the ALJ relied upon the VE's testimony to find Plaintiff capable of performing work that existed in significant numbers in the national economy, including jobs such as hospital cleaner, industrial sweeper cleaner, and hand packager. (R. at 24-25.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from November 29, 2010, through the date of his decision. (R. at 25.)

## II.   ANALYSIS

### A.   Legal Standards

#### 1.   Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g). "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 n. 1 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *Id.* Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *Id.* at 436.

## 2.       Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64. The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). When a claimant's insured status has expired, the claimant "must not only prove" disability, but that the disability existed "prior to the expiration of [his or] her insured status." *Anthony*, 954 F.2d at 295. An "impairment which had its onset or became disabling after the special earnings test was last met cannot serve as the basis for a finding of disability." *Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1.      An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.      An individual who does not have a "severe impairment" will not be found to be disabled.

3.      An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.      If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.      If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)

(currently 20 C.F.R. § 404.1520(a)(4)(i)-(v) (2012)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). After the Commissioner fulfills this burden, the burden shifts back to the claimant to show that he cannot perform the alternate work. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Loveland v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

B.   **Issues for Review**

Plaintiff raises two issues for review:

1.   Whether the ALJ complied with the Appeals Council remand;

2.   Whether the ALJ properly considered the opinion evidence of record.

(doc. 17 at 1.)

C.   **Appeals Council Remand Order**

Plaintiff argues that remand is required because the ALJ erred by failing to comply with the orders of the Appeals Council on remand. (Doc. 17 at 6.)

Upon remand, "an ALJ shall take any action that is ordered by the Appeals Council and may

make any determination that is not inconsistent with the remand order." *Valek v. Shalala,* 56 F.3d 1385, 1995 WL 337760, at *2 (5th Cir. 1995)(citing *Houston v. Sullivan*, 895 F.2d 1012, 1015 (5th Cir. 1989) and 20 C.F.R. § 404.977(b)); *see also* 20 C.F.R. § 416.1477(b) ("The administrative law judge shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order."). When an ALJ does not comply with orders from the Appeals Council on remand,"the clear rule is that remand is warranted only where the ALJ's decision fails to apply the proper legal standard or the decision is not supported by substantial evidence." *Henderson v. Colvin*, 520 F. App'x 268, 273 (5th Cir. 2013) (per curiam)

Here, the Appeals Council on remand ordered the ALJ to do the following:

Obtain updated medical records from the [Plaintiff's] treating and other medical sources, including clinical findings, test results, and medical source statements about what [Plaintiff] can do despite the impairment. As the [Plaintiff] is represented, the representative may be enlisted as necessary in securing the additional evidence. If the additional evidence does not clearly depict [Plaintiff's] limitations, obtain a consultative examination, including a medical source statement about what the [Plaintiff] can do despite the impairments.

(R. at 146.) Plaintiff argues that the ALJ did not comply with this order from the Appeals Council because he did not consider the updated treatment notes and did not obtain "updated evidence depicting what [Plaintiff] is able to do despite his impairments in the form of medical source statements." (Doc. 17 at 6.) He points specifically to the ALJ's failure to consider the treatment notes from Metrocare Services dated January 2013, to March 2014, and the treatment notes from the North Texas VA dated November 2013, to June 2014. (Doc. 17 at 6.)

The ALJ obtained updated medical records from both Metrocare and the North Texas VA and included them as exhibits. (R. at 29-30.) He did not, however, address any of the updated

14

medical records in his opinion except for a section on the North Texas VA's "letter at [Plaintiff's] request" stating that Plaintiff carried a diagnosis of schizoaffective disorder. (R. at 22.) The ALJ found that this statement deserved little weight because the North Texas VA "indicated no specific familiarity with [Plaintiff's] treatment." (R. at 24.) He did not include any updated medical source statements regarding Plaintiff's abilities despite impairment, contrary to the order from the Appeals Council on remand. This was error.[6]

The Fifth Circuit has held that "[p]rocedural perfection in administrative proceedings is not required.  This court will not vacate a judgment unless the substantial rights of a party have been affected. . . . The major policy underlying the harmless error rule is to preserve judgments and to avoid waste of time." *Anderson v. Sullivan*, 887 F.2d 630, 634 (5th Cir. 1989) (quoting *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988)) (per curiam).  "[P]rocedural improprieties . . . will therefore constitute a basis for remand *only if* such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision." *Alexander v. Astrue*, 412 F. App'x 719, 722 (5th Cir. 2011) (emphasis added); *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988).  The ALJ's error is harmless if the substantial rights of a party have not been affected.  *See Alexander*, 412 F. App'x at 722.

### 1.    *Treatment Notes*

The ALJ "is responsible for assessing the medical evidence and determining the claimant's [RFC]." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985).  The ALJ may find that a claimant has

---

[6]  To the extent that Plaintiff argues that the ALJ's failure to comply with the Appeals Council order immediately constitutes reversible error, his contention is without merit because the Fifth Circuit has held in an unpublished opinion that "the clear rule [when the ALJ fails to follow a remand order] is that remand is warranted only where the ALJ's decision fails to apply the proper legal standard or the decision is not supported by substantial evidence." *Henderson v. Colvin*, 520 F. App'x 268, 273 (5th Cir. 2013)(per curiam).

no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists.  *See* SSR 96–8p, 1996 WL 374184, at *1.  The ALJ's decision can be supported by substantial evidence even if he does not specifically discuss all the evidence that supports his decision or all the evidence that he rejected. *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994).  A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record.  *Leggett*, 67 F.3d at 564.

Here, the ALJ in his opinion stated that he "considered the entire record" but specifically detailed the medical records and treatment notes from Metrocare Services between November 30, 2010, and April 24, 2012, the medical records and treatment notes from Dr. Fletcher's consultative examination on January 3, 2011, the PRT form from Dr. White on March 3, 2011, and the medical records from the North Texas VA. (R. at 18-22.) He then found that "a comprehensive view of the entire record reflects the lack of consistent compliance by the failure to take all medications as prescribed" and that Plaintiff "was able to function independently." (R. at 22.) Overall, he determined that "other than required medication reminders, [Plaintiff's] mental health symptoms do not substantially interfere with his ability to independently manage his self-care" and that he met the "basic demands of competitive, renumerative, unskilled work." (R. at 22-23.)

The updated treatment notes from Metrocare Services and the North Texas VA, are consistent with the ALJ's findings. They encompass approximately ten routine follow-ups with Nurse Harris between January 21, 2013, and March 18, 2014. (R. at 689-716, 787-93.) They stated that Plaintiff "appears to be responding well to current medications" and his "depressive symptoms

have somewhat improved." (R. at 691, 707.) His condition and symptoms were consistent during this time, and his assessment comments were nearly identical for the five treatment sessions from October 30, 2013, to March 18, 2014, in which Nurse Harris noted that Plaintiff was "quick-tempered" but denied "any physical altercations over the past few months," and that he continued to need medication management to assist with his aggressiveness, paranoia, and irritability. (R. at 710, 713, 716, 788, 792.) The only signs of a "worsening condition" were Plaintiff's own self-reports that he was "feeling like [his] old self" and was not progressing. (R. at 695, 699.) The ALJ, however, found in his opinion that the Plaintiff's "allegations concerning his impairments and the impact on his ability to work are not entirely credible in light of the clinical findings." (R. at 22.) Likewise, the clinical findings in the updated treatment notes do not support Plaintiff's self-reported allegations of his worsening condition.

The treatment notes from the North Texas VA encompass several visits with many different nurses and social workers between November 19, 2013, and June 6, 2014. (R. at 717- 862.) The treatment notes clearly explain that Plaintiff did not want to receive treatment there because he "doesn't trust the government" but had to "transfer [his] care from Metrocare." (R. at 746-47.) His self-reports of his mental impairments are consistent with the earlier treatment notes about auditory hallucinations and irritability; however, every single mental examination concluded that he was "calm and cooperative" with "good eye-contact" and that his thought process was "organized, linear, [and] goal-directed." (R. at 757, 824, 836-37, 848.) He had a consultation with vocational services who determined that he did not have any medical or psychiatric precautions/limitations on finding full-time competitive employment. (R. at 807.) The only objective clinical medical notes that Plaintiff points to are the notes regarding his loss of over 16 pounds from March 30, 2014, to June

9, 2014. (R. at 816.) He argues that this weight loss was evidence of a worsening condition; however, this section in the treatment notes was from a hepatologist at the North Texas VA who was treating Plaintiff for his hepatitis C, and the weight loss never came up during any of his mental status examinations. (R. at 816.) Overall, all of the treatment notes from the North Texas VA are consistent with the ALJ's findings in his opinion and illustrate the ALJ's conclusion that Plaintiff was consistent and stable while on medication.

Even if the ALJ had gone line-by-line with the updated treatment notes, it would not have changed the outcome of the disability determination. *See Webb*, 2010 WL 1644989, at *11. Because Plaintiff's treatment records support the ALJ's decision, a different administrative conclusion would not have been reached absent the error. *See Bornette*, 466 F. Supp. 2d at 816. Consideration of the updated treatment notes would not have changed the outcome of the disability determination.

### 2.      *Medical Source Statements*

The ALJ did not include or consider any updated "medical source statements about what the [Plaintiff] can do despite the impairment," even though he was ordered to do so by the Appeals Council on remand. (R. at 147.)  He stated in his opinion that he "considered the entire record" but specifically included the medical source statements of Dr. Newton from Metrocare Services on May 12, 2011, and a mental residual functional capacity assessment from Dr. White, a SAMC, on March 3, 2011. (R. at 20-21.) These are the only medical source statements in the record. (R. at 1-3.) The ALJ primarily adopted Dr. White's assessments because he found that little weight should be assigned to Dr. Newton's medical source statement because it "made no objective clinical findings or notes to support the opinion" and it was "not well supported by the remainder of the record or

consistent with the record as a whole." (R. at 23.)

Plaintiff did not submit any updated medical source statements before or after the hearing or to the Appeals Council as new evidence of his "worsening condition." (Doc. 17 at 6-7.) He only argues that the ALJ erred by not including these updated medical source statements because the "updated evidence of record did not 'clearly depict' [his] work-related limitations." (*Id.* at 7.) Plaintiff has failed to explain how any updated medical source statements would have specifically affected the ALJ's determination, especially because the updated medical records illustrate that Plaintiff's condition was consistent and stable when his medication was taken, as discussed above. *See Jones v. Astrue*, 691 F.3d 730, 734 (5th Cir. 2012) (holding that there was no prejudicial error because the claimant "offered no evidence that additional records . . . would have had an effect on the judgment or that they even exist"). Plaintiff has failed to sustain his burden to show prejudicial error because the "mere allegation that additional beneficial evidence might have been gathered had the error not occurred is insufficient" to show prejudice. *Quazi v. Colvin*, No. 4:15-002257, 2016 WL 3522789, at *8 (S.D. Tex. June 27, 2016) (citing *Jones*, 691 F.3d at 735).

In conclusion, because the ALJ's consideration of the updated treatment notes and additional medical source statements would not have changed the outcome of the disability determination, remand is not required on this issue.  *See Morris*, 864 F.2d at 336 ("[E]ven if such an impropriety exists, it does not render the ALJ's determination unsupported by substantial evidence, and thus does not prejudice [the claimant's] substantive rights.").

## D.  <u>Medical Opinion Evidence</u>

 Plaintiff contends that the ALJ erred by failing to give controlling weight to Dr. Newton's medical opinions as Plaintiff's treating physician. (Doc. 17  at 9.) The Commissioner responds by

arguing that Dr. Newton was not Plaintiff's treating physician and the ALJ properly weighed her medical opinions. (Doc. 28 at 5-7.)

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence. 20 C.F.R. § 404.1529(b). Every medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a treating source. *Id.* § 404.1527(c)(2). A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has or has had an ongoing treatment relationship with the claimant. *Id.* § 404.1502. When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight. *Id.* § 404.1527(c)(2). If controlling weight is not given to a treating source's opinion, the Commissioner considers six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion." *See id.* § 404.1527(c)(1)–(6).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton*, 209 F.3d at 455. If evidence supports a contrary conclusion, an opinion of any physician may be rejected. *Id.* A treating physician's opinion may also be given little or no weight when good

cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id.* at 455–56. Nevertheless, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [then] 20 C.F.R. § 404.1527(d)(2)." *Id.* at 453. A detailed analysis is unnecessary, however, when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another" or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458.

Here, after a psychiatric diagnosis interview on November 30, 2010, Dr. Newton assigned Plaintiff a current GAF score of 35 and diagnosed him with major depressive disorder and posttraumatic stress disorder. (R. at 467.) She met with him only one other time during a medical assessment of ability to do work-related activities (mental) on May 12, 2011. (R. at 606-08.) While she signed as the "supervising psychiatric" on this form, it is not clear if she actually examined the Plaintiff in person because the "service provider" listed by Metrocare Services was actually Nurse Harris. (R. at 606.) On this form, Dr. Newton and Nurse Harris determined that Plaintiff had "extreme limitations" in twelve mental categories, including understanding instructions, responding appropriately to work situations, and adapting to changes in a work routine. (R. at 606-07.)

Neither of the other two examining physicians, Dr. Fletcher and Dr. White, determined that Plaintiff suffered from limitations to this extent in his mental capacities. On January 3, 2011, Dr.

Fletcher performed a consultative examination on Plaintiff where she did not determine any extreme limitations on Plaintiff's mental capacities but instead provided a "guarded" prognosis because his symptoms appeared to "wax and wane" where the duration of his symptoms varied. (R. at 481-86.) On March 3, 2011, Dr. White, a SAMC, similarly did not identify any extreme mental limitations with Plaintiff and instead determined on a Mental Residual Functional Capacity Assessment Form that Plaintiff had mild restrictions in daily living, moderate difficulties in maintaining social functioning and concentration, persistence or pace, and that he did "not reflect a degree of mental/emotional signs or symptoms that work related abilities/activities would be significantly/consistently compromised." (R. at 514-20.)

The ALJ in his opinion found that Dr. Newton's medical opinions should be given little weight because her medical source statement "assessment was based on a brief month treatment history" and her other medical opinions were "not well supported by the remainder of the record or consistent with the record as a whole," namely from the medical opinions of Dr. Fletcher and Dr. White.  (R. at 23.) The ALJ did not identify Dr. Newton as a treating physician because the record showed that she met with Plaintiff only once before she completed her medical source statement.[7] (R. at 23.)

The ALJ did not err by failing to find that Dr. Newton was a treating physician whose opinion deserved controlling weight under 20 CFR 416.927(c) because there is no record evidence

---

[7] To the extent that Plaintiff is arguing that Metrocare Services itself should be considered his "treating physician" and given controlling weight pursuant to 20 CFR 416.927(c), the ALJ did not err because courts in this district have differentiated between the medical opinions of various doctors at Metrocare when considering the opinions of treating physicians.  *See, e.g. Bookman v. Colvin*, 3:13–CV–4428–B, 2015 WL 614850, at *8 & n.3 (N.D. Tex. Feb. 12, 2015) (noting the inconsistency between the medical records of the treating physician at Metrocare and other Metrocare professionals); *Martinez v. Colvin*, No. 4:12–CV–542–A, 2013 WL 5227060, at *3-5 (N.D. Tex. Sept. 16, 2013) (considering individually a treating physician at Metrocare); *Lee v. Astrue*, No. 3:10–CV–155–BH, 2010 WL 3001904, at *8 & n.6 (N.D. Tex. July 31, 2010) (noting that the opinions of a doctor at Metrocare were based on his examination and role in the plaintiff's treatment and not the role of other Metrocare doctors in the plaintiff's treatment).

that Dr. Newton actually was Plaintiff's treating physician. *See Hernandez v. Heckler*, 704 F.2d 857, 860–61 (5th Cir. 1983) (affirming finding that a doctor who saw claimant twice in a 17 months was not a treating physician). As the trier of fact, the ALJ was entitled to weigh the evidence against other objective findings, including the opinion evidence available, and the record as a whole. Substantial evidence properly supports the ALJ's appropriate evaluation of the medical opinions. Accordingly, a reviewing court must defer to the ALJ's decisions. *See Leggett*, 67 F.3d at 564.

Since the ALJ afforded the appropriate weight to the physicians' opinions, remand is not required on this issue.

### III.  CONCLUSION

The Commissioner's decision is **AFFIRMED.**

**SO ORDERED** this 28th day of September, 2016.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE